IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 22, 2008

## STATE OF TENNESSEE v. DENNIS CHARLES ARELLANO, A/K/A CHUCK ARELLANO, A/K/A DR. CHUCK ARELLANO

**Appeal from the Circuit Court for Franklin County
Nos. 17076, 17152   Thomas W. Graham, Judge**

---

**No. M2007-02394-CCA-R3-CD - Filed March 19, 2009**

---

The defendant, Dennis Charles Arellano, a/k/a Chuck Arellano, a/k/a Dr. Chuck Arellano, pled guilty to one count of TennCare fraud valued between $10,000 and $60,000, one count of impersonating a licensed professional, and one count of reckless endangerment. The defendant agreed to a total effective sentence of six years and restitution in the amount of $30,000, with the manner of service of the defendant's sentence left to the discretion of the trial court. Following a sentencing hearing, the trial court sentenced the defendant to nine months in the county jail and the balance of his sentence on probation. He was also ordered to perform 200 hours of public service work. On appeal, the defendant asserts that the trial court erred by denying his request for judicial diversion or, in the alternative, a sentence of full probation. After reviewing the record, we conclude that the trial court properly sentenced the defendant and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Joseph E. Ford, Winchester, Tennessee, for the appellant, Dennis Charles Arellano.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The record reflects that in May 2006, the Franklin County Grand Jury indicted the defendant on one count of theft of property valued over $60,000, one count of TennCare fraud valued over $60,000, and one count of impersonating a licensed professional based upon practicing medicine without a license. In July 2006, in a separate indictment, the grand jury indicted the defendant on one additional count of impersonating a licensed professional and fifteen counts of rape by fraud,

involving five victims. On July 20, 2007, the defendant pled guilty to one count of TennCare fraud valued between $10,000 and $60,000, a Class C felony, one count of reckless endangerment, a Class E felony, and one count of impersonating a licensed medical professional, a Class E felony. The remaining counts of the two indictments were dismissed.

At the guilty plea submission hearing, the prosecutor summarized the proof that the state would have presented had the case gone to trial. Between May 1998 and May 2006, the defendant's father, a licensed physician,[1] operated a medical practice in Huntland, Tennessee. During that time, the practice filed claims with several insurance companies through the state's TennCare program. TennCare paid the practice approximately $1,099,000.00 during this eight-year period. Additionally, during this time "a female patient of the Arellano practice, whose daughters had been a patient [sic] there made a claim . . . regarding a concern about some treatment provided to her daughter." The person treating that patient was the defendant, who was not licensed to practice medicine. The complaint led the Tennessee Bureau of Investigation (TBI) to investigate the practice's insurance billings during the period.

According to the prosecutor, in the course of the investigation, the defendant admitted to the TBI that he had attended medical school in Grenada but had never been licensed to practice medicine in any state. The defendant told investigators that his father hired him to be his office manager, but once the number of patients seen by the practice increased from "about eight patients a day to 50 patients a day . . . [the defendant's] father could not handle that," so the defendant began seeing patients. The defendant admitted to investigators that he was called "Doctor Chuck" by patients, and that he saw "at least 40 percent of the [practice's] patients." The defendant said that he billed TennCare for the patients he saw, using his father's name when filing the TennCare claims. The prosecutor noted that of the insurance claims paid to the practice during the eight-year period covered by the indictment, "in excess of quarter million dollars of insurance proceeds had been paid out inappropriately."

Pursuant to the plea agreement, the defendant was sentenced to four years for TennCare fraud, two years for reckless endangerment, and two years for impersonating a licensed professional. The two-year sentences were imposed concurrently to each other but consecutively to the four-year sentence, resulting in an effective six-year sentence. The defendant also agreed to pay the state $30,000 in restitution. The manner of service was left to the discretion of the trial court, which held a sentencing hearing on August 31, 2007. Before the hearing, the defendant filed a motion seeking judicial diversion.

At the sentencing hearing, Lona Medley testified that she and her three daughters were patients at the medical practice operated by the defendant's father. Medley said that the defendant

---

[1]According to the prosecuting attorney, the defendant's father died before the defendant entered his guilty plea.

provided medical care for her and her three daughters, including performing pap smears for Medley. She said that one day,[2] she noticed a "knot sticking out" of her daughter Erica's shirt, a knot which Medley described as "a knot as big as [a] fist in her chest." At that point, she called the defendant, who examined Erica. The defendant told Medley and Erica that Erica had a lymph node infection. After Erica took antibiotics for two weeks without improving, Medley took her daughter back to the defendant, who responded by saying "he would try another antibiotic." After two more weeks, Medley began to believe that "something else [was] wrong with her," so she attempted to speak to the defendant, who refused to speak with her. Medley spoke with a nurse at the practice, telling the nurse that Erica needed "an ultrasound or something because those meds that he had gave her [were] not working." According to Medley, the nurse asked the defendant to approve the ultrasound, but the defendant denied the request.

Medley said that she made additional requests for an ultrasound, but that the defendant kept denying the requests. Ultimately, on December 15, 2003, Erica was given an ultrasound exam. The next day, Medley called the defendant's office and requested the results. According to Medley, "[t]hey told me that everything was fine, in the ultrasound, that everything looked normal." However, still concerned over Erica's condition, Medley requested that the defendant refer Erica to another physician, Dr. Rudolph.[3] The defendant denied the request, which led Medley to personally visit the practice and angrily request that the defendant refer her daughter to Dr. Rudolph. The defendant acquiesced, and after Dr. Rudolph examined Erica, she was sent to Vanderbilt Medical Center, where Dr. Herbert Schwartz conducted a biopsy on March 5. The biopsy revealed that Erica had chondrosarcoma, a bone cancer.

Medley said that initially, Erica was only given six months to live. She noted that Erica had "beat[en] the odds" by surviving three years after her initial diagnosis, but as of the sentencing hearing, the cancer had returned, with the cancer being present in both of Erica's hips. Medley said that her daughter had to go through "[n]inety-two hours of chemo each time she had to go and have chemotherapy. That's a lot of chemotherapy for a child, at seventeen years of age." She also noted that Erica endured six weeks of radiation treatment, and that the doctors "wanted to amputate her arm [and] half of her chest." Medley testified that while she did not blame the defendant for her daughter having cancer, she expressed concern over the fact that the defendant did little to treat Erica over the course of several months.

Medley testified that she suffered from depression and anxiety attacks as a result of her family's ordeal. She said that she felt "violated . . . by being touched and I have felt like I have been betrayed by a man who was supposed to be a doctor, my doctor. It is hard to trust a doctor now that

---

[2]Medley testified that she first noticed the "knot" in her daughter's chest in November 2002. However, medical records and testimony from TBI agent Kimberly Harmon confirm that the events concerning Medley's daughter actually occurred between November 2003 and February 2004.

[3]The physician's first name is not apparent in the record.

one has lied to [me]." She also felt that her children had been "violated" as well. Regarding the defendant's punishment, Medley said that "[i]mpersonating a doctor is a crime and he should have to pay for that." However, she also said that she did not believe that the defendant needed to be imprisoned.

Erica Scammon's testimony consisted of her reading her victim impact statement into the record. In the statement, she said that the defendant first examined her when she was twelve years old. When she experienced "bad cramps" during her period, she sought treatment by the defendant. She noted that the defendant also administered her pap smears and breast exams, and that the defendant also treated her younger sister when she experienced problems with her period. She then testified regarding the events which led to her being diagnosed with cancer, with the substance of her testimony largely mirroring that of her mother.

Scammon said that she was angry over the fact that she had been examined by the defendant when he was not a licensed physician. She said that she did not blame the defendant for her having cancer, but she also said, "I don't understand why I had to go through five months of miserable suffering for no reason." She said that while she did not believe the defendant needed to be imprisoned, and while she felt that the defendant would make a good doctor were he to get his license, she opined that "something need[ed] to be done" to the defendant. She noted that she had gone through "an emotional, physical, psychological[,] [and] mental state of depression and it's not fair for me and my family to sit back and have to go through what he did."

TBI Agent Kimberly Harmon testified that the TBI investigation of the practice run by the defendant's father started when Bob Kennedy, an investigator with BlueCross BlueShield of Tennessee, informed her that "he had visited the practice and had interviewed some patients and the findings were that [the defendant] was practicing as a physician and the insurance company had billed as if he was a credentialed physician[,] [but] he was not." Agent Harmon testified that the insurance company paid the claims "as if it was [the defendant's father] seeing the patients because he was credentialed with BlueCross BlueShield and licensed in the State of Tennessee to do so." During the investigation, Agent Harmon and another TBI agent interviewed the defendant, who told the agents that his father had estimated that the defendant's patients accounted for 40 percent of the claims filed by the practice. Agent Harmon testified that the actual amount paid by TennCare based on claims filed as a result of work done by the defendant was "a little over $220,000."

Agent Harmon testified that the TBI investigation identified several women to whom the defendant had given pap smears. However, she said that some of the defendant's patients did not want to be listed as victims in this case. Furthermore, the state stipulated that "the five listed victims [in the indictment] did not indicate that it appeared that he did this for any sort of sexual gratification." On cross-examination, Agent Harmon said that the defendant was cooperative during the TBI investigation, voluntarily turning over to TBI all of the practice's medical records from the time in question.

Six different witnesses, including the defendant's former pastor, brother-in-law, present employer, and family friends, testified for the defendant. The witnesses generally testified that the defendant was a good man who loved his family and who attended church regularly. The defendant's present employer, Brian Newmyer, testified that he owned a roofing company and employed the defendant as a shop manager. Newmyer testified that as part of the defendant's duties, he supervised "a couple of employees," interacted with "most customers" on sales, and helped unload materials from trucks. Newmyer said that the defendant, who had a set of keys to the business, was a dependable employee who earned approximately $26,000.00 per year. Newmyer said that despite his awareness that the defendant had been arrested and pled guilty in the instant case, he still trusted the defendant.

Cindy Arellano, the defendant's wife, testified that she met the defendant in 1980 while they attended college together. She married the defendant in July 1983, after which time they moved to Richmond, Virginia, where she enrolled in dental hygienist school and he enrolled at Virginia Commonwealth University. The defendant and Mrs. Arellano both graduated, with Mrs. Arellano working six years as a dental hygienist in Virginia. In 1988, the defendant enrolled in medical school at St. George's University in Grenada. Mrs. Arellano said that the defendant did not finish his classroom studies at St. George's until the winter of 1991 or 1992 because he took time off after the couple's first child was born.

Mrs. Arellano said that after the defendant finished his coursework at St. George's, he attempted to pass the first part of his medical boards, a process which "took a few tries." The defendant also spent some time in England, where he performed some clinical work. In December 1995, after he passed the first part of the American boards, the defendant did clinical work in Washington, D.C., and Brooklyn, New York. In April 1997, after he had finished his clinical work, the defendant, Mrs. Arellano, and their four children moved to Huntland, Tennessee, where the defendant worked at his father's newly-founded medical practice. Mrs. Arellano said that the defendant initially worked as an office manager, but he ultimately began seeing patients.

Mrs. Arellano said that the defendant was an excellent husband and father. She said that the defendant's devotion to his family was so strong that he neglected completing his board exams "because he would have [had] to be home and study for long periods of time[,] which would [have] le[ft] us without a means of support and a dad in the house." Regarding the family's financial situation, Mrs. Arellano said that the defendant never made a lot of money while he was working at his father's clinic. She said that the family would be forced to file for bankruptcy given the family's credit card and student loan debt.

The defendant testified that his father, who was seventy-two years old when he began his practice, established his practice in Huntland because "he wanted to help people who otherwise wouldn't be able to afford care or were disadvantaged through the medical community." The defendant said that he initially worked at the practice as the office manager, with his duties including

answering the office telephones and establishing a computerized billing system. He said that eventually, "it got to the point where instead of on a good day [the practice saw] 10 patients[,] on an average day we were seeing 15 or 20 patients." The number of the practice's patients continued to grow once the practice started accepting TennCare; the defendant said that by time the practice closed in July 2004, the practice saw thirty-five to forty patients per day.

The defendant said that he began seeing patients after being asked to do so by his father. The defendant said that his father closely supervised his work, changing treatment plans as necessary, and that his father wrote all prescriptions for the defendant's patients. The defendant said that he never believed that he was breaking the law by seeing patients without a license. He said that his patients called him "doctor," and while the trial court noted during the defendant's testimony that "to the man on the street . . . [being a doctor] [m]eans [having a] license to act as a doctor," the defendant said, "I'm an M.D. . . . That makes me a doctor." When asked about Erica Scammon, the cancer patient whom he had misdiagnosed, the defendant said, "I missed other diagnoses as well, and so did my father[,] and so does every other doctor I've ever worked with . . . ."

Regarding his financial situation, the defendant said that he never received a salary while employed at his father's practice. He also noted that he did not "remember exactly how" he was paid, an answer which prompted further questioning from the trial court, which expressed its disbelief with the defendant's answer. The defendant ultimately admitted that he was paid "somewhere in the neighborhood of 50 or [$]60,000" per year, and that he paid taxes on his earnings. On cross-examination, the defendant reiterated that he did not "recall exactly how money got funneled and switched" to his personal account, which again prompted the court to state its disbelief regarding the defendant's answer. The defendant also noted that he was unaware why TennCare stopped paying benefits to the practice. However, when the trial court told the defendant that "you were cut off TennCare for improper conduct," the defendant admitted that the trial court's statement was correct. Upon additional questioning by the trial court, the defendant admitted that his father, who was eighty years old when his practice shut down, was incapable of fully supervising his (the defendant's) activities given his father's declining health.

At the conclusion of the sentencing hearing, the trial court denied the defendant's motion for judicial diversion. The trial court imposed a sentence of split confinement, ordering that the defendant serve nine months in the county jail and the balance of his six-year sentence on probation. The trial court also ordered the defendant to perform 200 hours of public service work. This appeal followed.

ANALYSIS

*Denial of Judicial Diversion*

The defendant first contends that the trial court erred in denying judicial diversion. Because

-6-

the defendant, who had no prior criminal record, was convicted of one Class C felony and two Class E felonies, he was eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B) (2006). However, a defendant who is eligible for judicial diversion is not entitled to diversion as a matter of law. See State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000)). The decision to grant judicial diversion lies within the discretion of the trial court and will not be disturbed on appeal unless it is shown that the trial court abused its discretion. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A denial of judicial diversion will not be overturned if the record contains any substantial evidence to support the trial court's action. Id. (citations omitted).

When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's mental and physical health and (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997) (citations omitted). Additional factors which may be considered include the defendant's attitude, his behavior since arrest, his home environment, current drug usage, emotional stability, past employment, general reputation, family responsibilities, and the attitude of law enforcement. Id. (citing State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993)). The decision should be based on whether the grant of diversion will serve the ends of justice for both the public and the defendant. Id. The record must reflect that the trial court considered and weighed all these factors in arriving at its decision. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998).

In its order denying judicial diversion, the trial court indicated that several factors weighed in favor of granting diversion. The court noted that the defendant had no prior criminal record or record of illegal drug use, had a favorable social history, and was in good physical and mental health. The trial court also noted that the defendant's marriage appeared to be stable and that his children "appear to have thrived." However, the trial court noted that several of the other factors were either "at best neutral" or weighed against diversion. In its order, the trial court noted that the defendant's lack of stable employment between graduating from medical school and beginning work at his father's practice negatively affected the "past employment" and "family responsibility" factors. The trial court specifically noted that the defendant's attitude, reflected in his assertion that his error in misdiagnosing Erica Scammon was something that any doctor could have done, and in his belief that he had done nothing wrong by practicing without a license, was especially disturbing. The trial court found that the defendant's attitude negatively affected his amenability toward correction. The trial court also found that the nature of these offenses, which the trial court described as "reckless and continu[ing] for a period of years," were such that "[granting] diversion would demean the significance of a medical license and proper medical standards," and that granting diversion "would have the effect of condoning such crimes." In light of these conclusions, the trial court concluded that the "deterrent effect" and "serving the ends of justice" factors weighed heavily against diversion, and based largely on these factors, the trial court denied diversion.

Our review of the record indicates that the trial court considered all of the required factors in reaching its decision and that its reasons for denying judicial diversion were fully supported by the record. Accordingly, we conclude that the trial court did not abuse its discretion by denying judicial diversion.

*Denial of Full Probation*

The defendant also argues that the trial court erred in denying him full probation. The trial court denied full probation based upon its finding that full probation would "depreciate the seriousness of the offense." The state contends that the trial court appropriately denied full probation based upon this factor. We agree.

Tennessee's former sentencing act, under which the defendant was sentenced, provided that a defendant who did not possess a criminal history showing a clear disregard for society's laws and morals, had not failed past rehabilitation efforts, and was "an especially mitigated or standard offender convicted of a Class C, D, or E felony [was] presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (amended 2005); see also State v. Fields, 40 S.W.3d 435, 440 (Tenn. 2001). Mindful of this presumption, the trial court ordered the defendant's six-year sentence to be served in split confinement, with the defendant serving nine months in the county jail and the balance of his sentence on probation. See Tenn. Code Ann. § 40-35-104(c)(4) (one of the many alternative sentencing options the trial court may impose is "[a] sentence of periodic confinement that may be served in a local jail or workhouse in conjunction with a term of probation[.]").

However, "[t]he determination of whether the appellant is entitled to an alternative sentence and whether the appellant is entitled to full probation are different inquiries." State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Where a defendant is entitled to the statutory presumption of alternative sentencing, the state has the burden of overcoming the presumption with evidence to the contrary. State v. Bingham, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000). Conversely, the defendant has the burden of establishing his or her suitability for full probation, even if the defendant is entitled to the statutory presumption of alternative sentencing. Id.; see Boggs, 932 S.W.2d at 477. No criminal defendant is automatically entitled to probation as a matter of law. State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). Rather, the defendant must demonstrate that probation would "subserve the ends of justice and the best interests of both the public and the defendant." State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citations omitted).

In this case, the trial court denied the defendant's request for probation to avoid depreciating the seriousness of the defendant's offenses. Although the trial court did not include the "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an exaggerated degree"

language in its ruling denying full probation,[4] a finding that the crime was especially shocking or offensive was inherent in the remainder of the trial court's findings. The trial court noted that "the licensing issue is really important because the license itself is the protection the public has . . . when they go in and seek [medical advice]," and that the public demands that the advice it receives "is within some reasonable level of medical competence. The wors[t] thing that can happen is a disease that is undiagnosed . . . it's important to the public that we just not say that well, whether you have a license or not, no big deal." The trial court stated that the defendant "should have known that he wasn't up to standards on his medical knowledge" and that his father was unable to adequately supervise his work given his father's health issues. Furthermore, the trial court noted that this case was important in maintaining the integrity of the TennCare system, stating, "Whether [money] in this case [was] the prime reason for it, there's a lot of incentive if people thought they could get away with a relatively small to no punishment . . . we need to make sure that people [who] do this are qualified and legal to do that." Additionally, as stated above, in denying the defendant judicial diversion the trial court found that the defendant's potential for rehabilitation was low based on the defendant's belief that he had done nothing wrong, and it also found that alternative sentencing in this case would not serve the ends of justice. The trial court's findings were also indicative that the nature of the offense far outweighed any factors weighing in favor of granting full probation. As such, we conclude that the trial court did not abuse its discretion in imposing a sentence of split confinement.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[4]When the "seriousness of the offense" factor forms the basis for denying alternative sentencing, "'the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an exaggerated degree,' and the nature of the offense must outweigh all factors favoring a sentence other than confinement." State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997) (citations omitted).